# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| RAYMOND F. DERONDE, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 7:11-998 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of the Social | § | |
| Security Administration, | § | |
| | § | |
| *Defendant*. | § | |

## REPORT AND RECOMMENDATION

Plaintiff Raymond F. Deronde ("Deronde") brings this action under 42 U.S.C. § 405(g), seeking review of an adverse decision on his application for disability-based benefits under the Social Security Act. Complying with General Order # 18 (Dkt. No. 2), the parties join issues through competing briefs.[1]

## I. Background

Deronde applied for disability insurance ("DIB") and supplemental security income ("SSI") benefits claiming that he became disabled as of December 14, 2007, due to: *diabetes, disc problems in his back, aneurysm, high blood pressure, high triglycerides, and rapid drops in blood pressure.* (T. 154, 158).[2] Eventually, his application came on for an evidentiary hearing before an

---

[1]    General Order #18 is dated September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders).  (Dkt. No. 2).

[2]    "T." followed by a number refers to the page of the administrative record.  (Dkt. No. 9).

administrative law judge, Marie Greener ("ALJ Greener").[3] (T. 17, 37-72). ALJ Greener issued a partially favorable decision holding that Deronde was disabled as claimed between the dates of December 14, 2007, and March 24, 2009, but that his disability ended as of March 25, 2009, because his condition medically improved so that he could return to substantial gainful employment. (T. 17-29).

Deronde appealed to the Appeals Council of the Social Security Administration's Office of Hearings and Appeals (T. 12), which declined Deronde's request to review. (T. 1-3). This rendered ALJ Greener's opinion the final decision. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Deronde timely instituted this case on August 22, 2011. (Dkt. No. 1).

## II.  Preliminary Discussion

This is an atypical case. ALJ Greener held that Deronde was disabled for a finite period (in social security parlance, a "closed period"[4]) ending on March 24, 2009, well before ALJ Greener's decision on August 13, 2010. Thus, in the same proceeding, ALJ Greener both awarded and terminated benefits.

The purpose of this preliminary discussion is to delineate governing principles that are especially pertinent to this *ad hoc*, almost aberrant case.

---

[3]      Deronde initially appeared, *pro se*, before ALJ Greener on April 1, 2010.  (T. 64-72).  He testified that his representative withdrew from his case immediately prior to the hearing date.  (T. 64).  In order to allow Deronde to obtain new counsel, the hearing was rescheduled for June 3, 2010.  (T. 64-72).

[4]      A closed period of disability refers to when a claimant is "found to be disabled for a finite period of time which started and stopped prior to the date of the administrative decision granting disability status." Alan G. Skutt, *Annotation, Social Security: Applicability of Medical-Improvement Standard in Determining Continuing Eligibility for Disability Benefits to "Closed Period" Beneficiaries*, 93 A.L.R. Fed. 161 (1989).

## A. Eligibility for Benefits

DIB and SSI are two distinct programs under the Social Security Act.[5] To receive benefits under these statutory provisions, applicants must prove that they are disabled. That term is defined as *"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3).

The Commissioner utilizes a five-step evaluation procedure for adjudicating disability claims. *See* 20 C.F.R. §§ 404.1520(a), 416.920.[6] It has

---

[5] Disability Insurance benefits, authorized by Title II of the Social Security Act and funded by social security taxes, provide income to insured individuals forced into involuntary, premature retirement by reason of disability. Supplemental Security Income benefits, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provide an additional resource to assure that disabled individuals' income does not fall below the poverty line. Maximum benefits available under SSI are considerably less than under DIB.

[6] In this circuit, the Commissioner's five-step sequential procedure is described as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment [that meets or equals a] listed [impairment] in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (citing *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1520, 416.920)).

judicial approval as a fair and just way for determining disability applications in conformity with the Social Security Act. *See Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler*, 461 U.S. at 461) (use of the sequential evaluation process "contribute[s] to the uniformity and efficiency of disability determinations")).

Under this analytical model, a claimant has the burden to prove a *prima facie* case of disability by securing favorable findings during the first four steps. *DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998); *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984). The burden then shifts to the *Commissioner* to rebut that case by showing at Step 5 that "there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also DeChirico*, 134 F.3d at 1180; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); 20 C.F.R. §§ 404.1566, 416.966.

B.    *Cessation of Benefits*

Termination of benefits can occur when *medical improvement* restores a recipient's ability to work. 42 U.S.C. 423(f); 20 C.F.R. §§ 404.1594, 416.994; *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2003); *De Leon v. Secretary of Health & Human Servs.*, 734 F.2d 930, 937 (2d Cir. 1984) ("If the claimant's condition improves to the point where he or she is able to engage in substantial activity, benefits are no longer justified, and may be terminated by the [Commissioner]."). "Medical improvement" means "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [he or she was] disabled or continued to be disabled." 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(f).

"[A] determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [a claimant's] impairment(s)." 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). And, before terminating previously- awarded benefits, "the SSA [Social Security Administration] must compare 'the current medical severity of th[e] impairment [ ] . . . to the medical severity of that impairment[] at th[e] time' of the most recent favorable medical decision." *Veino*, 312 F.3d at 586–87 (quoting 20 C.F.R. § 404.1594(b)(7) (alteration in original)).

To satisfy these requirements, the Commissioner employs another sequential analysis – this one involving as many as eight steps – to determine whether or when to terminate previously awarded benefits due to medical improvement.[7] These steps are intended "[t]o assure that disability reviews are carried out in a uniform manner . . . and that any decisions to stop disability benefits are made objectively, neutrally and are fully documented." 20 C.F.R. §§ 404.1594(f), 416.994(b)(5).[8]

---

[7]    The eight-step analysis pertains to DIB recipients. When applying a medical improvement standard to a SSI recipient, regulations establish an identical process with the exception that Step 1 is eliminated. *See* 20 C.F.R. § 416.994(b)(5)(i)-(vii) (seven-step regulatory framework for SSI); *compare with* 20 C.F.R. § 404.1594(f)(1)-(8) (eight-step evaluation for DIB).

[8]    This analysis asks:

    (1)    Are you engaging in substantial gainful activity?  If you are . . . we will find disability to have ended . . . .

    (2)    If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart?  If you do, your disability will be found to continue.

    (3)    If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? . . . .

    (4)    If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section . . . .

                                                              (continued...)

This analysis is employed most commonly at subsequent "continuing disability review" proceedings.[9]   Several circuits, however, hold that it is also appropriate for initial-application determinations resulting in benefits awards for closed periods.  *See  Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir. 2002); *Shepherd v. Apfel*, 184 F.3d 1196, 1200 (10th Cir. 1999); *Pickett v. Bowen*, 833 F.2d 288, 292–93 (11th Cir. 1987); *Chrupcala v. Heckler*, 829 F.2d 1269, 1274 (3d Cir. 1987); *see also Burress v. Apfel*, 141 F.3d 875, 879-80 (8th Cir. 1998); *Jones v. Shalala*, 10 F.3d 522 (7th Cir. 1993); *Carbone v. Astrue*, No. 08–CV–2376 (NGG), 2010 WL 3398960, at *13 (E.D.N.Y. Aug. 26, 2010); *Chavis v. Astrue*, No. 07–CV–0018 (LEK), 2010 WL 624039, at *5 (N.D.N.Y. Feb. 18, 2010); *Hall v.*

[8](...continued)
    (5)   If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. . . .

    (6)   If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe . . . .

    (7)   If your impairment(s) is severe, . . . we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past.  If you can do such work, disability will be found to have ended.

    (8)   If you are not able to do work you have done in the past, we will consider one final step. Given the residual functional capacity assessment and considering your age, education and past work experience, can you do other work? If you can, disability will be found to have ended.  If you cannot, disability will be found to continue.

20 C.F.R. § 404.1594(f)(1)-(8).

    [9]    When the Commissioner has determined that a claimant is disabled, the agency from "time to time" conducts a "continuing disability review" to periodically evaluate the claimant's eligibility to receive disability benefits. *See* 20 C.F.R. §§ 404.1589, 416.989.  The Commissioner may determine that the claimant is no longer entitled to such benefits if "the physical or mental impairment on the basis of which such benefits [were] provided has ceased, does not exist, or is [no longer] disabling." 42 U.S.C. § 423(f); 42 U.S.C. § 1382c(a)(4).

*Chater,* No. 94–CV–1401 (FB), 1996 WL 118544 (E.D.N.Y. Mar. 8, 1996). The Second Circuit has not confirmed whether the eight-step process is appropriate for closed-period disability cases. *Carbone*, 2010 WL 3398960, at *13. District courts in the Second Circuit, however, note that it is an appropriate standard. *Chavis*, 2010 WL 624039, at *6; *Abrams v. Astrue*, 2008 WL 4239996, at *2 (W.D.N.Y. Sept. 12, 2008).

Under this analytical model, the burden rests with the Commissioner at every step. *See* 20 C.F.R. §§ 404.1594(f)(1)-(8), 416.994(b)(5)(i)-(vii); *see also Chavis*, 2010 WL 624039, at *4 ("medical improvement standard requires the Commissioner to meet a burden of showing, by substantial evidence, that a medical improvement has taken place in a claimant's ability to perform work activity") (internal citations omitted); *Abrams*, 2008 WL 4239996, at *2 ("The Commissioner has the burden of persuasion to demonstrate medical improvement, in accordance with the eight-step sequential evaluation process set forth in the Regulations at 20 C.F.R. § 404.1594(f)."); *Suriel v. Commissioner of Soc. Sec.*, 2006 WL 2516429, at*4 (E.D.N.Y. Aug. 29, 2006) ("The Commissioner has the burden of persuasion to prove that the individual is currently able to engage in substantial gainful activity.").

C.    *Overlapping Criteria*

Obviously, the 5-Step analysis (disability) and the 8-Step analysis (medical improvement) are distinct with differing objectives and dissimilar burdens of proof. Nonetheless, they share certain core administrative concepts, and involve common challenges. In either scenario, an evidentiary record must be developed fully, and credibility choices must be made. Both contemplate assessment of a claimant's "residual functional capacity." And, in each instance, an administrative adjudicator may (in appropriate circumstances) take

administrative notice of disability *vel non* by adopting and applying findings published in "*Medical-Vocational Guidelines*," commonly called *"the grids." See* Section II.*C.4., infra.*

The remainder of this section delineates principles governing these common issues pertinent to judicial review in this particular case.

### 1.   Developing a Full Record

"Social Security disability determinations are investigatory, or inquisitorial, rather than adversarial." *Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009) (internal quotation marks omitted). "It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting [or continuation] of benefits." *Id*. (internal quotation marks omitted); *accord Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999). In this regard, an ALJ is required to develop the medical record:

> In making any determination with respect to whether an individual is under a disability *or continues to be under a disability*, the Commissioner of Social Security shall consider all evidence available in such individual's case record, and shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability. In making any determination the Commissioner of Social Security shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis.

42 U.S.C.A. § 423(d)(5)(B) (emphasis added).

"Accordingly, an ALJ may not rely, as factfinders in adversarial proceedings customarily do, on the *absence* of probative evidence supporting the opinions of a claimant's expert, without making an affirmative effort to fill any

gaps in the record before him." *Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 450 (S.D.N.Y. 2004) (internal quotation marks and citations omitted). Instead, ALJs must make "every reasonable effort to help [the claimant] get medical reports from [his or her] own medical sources." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (quoting 20 C.F.R. § 404.1512(d)). Thus, when evidence in hand is inadequate for an ALJ to determine whether a claimant is disabled, the ALJ should re-contact the treating physician or other medical sources and request additional records. *See* 20 C.F.R. §§ 404.1512(e), 404.1520(c); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (noting that when there is an inadequate medical record, the ALJ must *sua sponte* seek additional information).

2.  Assessing Credibility

Forensically, "credibility" refers to believability of a witness and a determination of how much weight to give that witness's testimony. Special rules govern credibility assessments of claimants and opinions of their treating physicians.

a.  *Subjective Testimony*

Claimants must present objective evidence (medical signs and laboratory findings) of an underlying condition that reasonably could be expected to produce the subjective symptoms alleged. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). The best-informed (sometimes *only*) source of information regarding intensity, persistence and limiting effects of pain and other potentially disabling symptoms is the person who suffers therefrom. Testimony from claimants, therefore, is not only

relevant, but desirable. On the other hand, a claimant's testimony often is colored by interest in obtaining a favorable outcome. Hence, subjective symptomatology by itself cannot be the basis for a finding of disability. *See* 20 C.F.R. §§ 404.1512(a), 404.1528(a), 416.912(a), 416.928(a).

The exclusive prerogative for making credibility assessments, *i.e.*, deciding how much weight to give to claimants' subjective self-evaluations, rests with an ALJ. *See Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."). Fortunately, the Commissioner provides explicit guidance to administrative adjudicators for this difficult role. First, a formally-promulgated regulation requires – once an impairment is identified – consideration of seven specific, *objective* factors that naturally support or impugn subjective testimony of disabling pain and other symptoms.[10] Second, SSR 96–7p directs ALJs to follow a two-step process to evaluate claimants' allegations of pain:

---

[10]     An ALJ must evaluate a claimant's symptoms based on the medical evidence and other evidence, including the following factors:

(i)    claimant's daily activities;
(ii)   location, duration frequency, and intensity of claimant's pain or other symptoms;
(iii)  precipitating and aggravating factors;
(iv)   type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
(v)    treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
(vi)   measures claimant uses or has used to relieve pain or other symptoms; and
(vii)  other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) . . . that could reasonably be expected to produce the individual's pain or other symptoms . . . .

> Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

SSR 96-7, 1996 WL 374186, at *2. The Ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*

Governing circuit law generally mirrors the Commissioner's Ruling. Thus, when an ALJ rejects a claimant's testimony of pain and limitations, he or she must provide explicit reasons for rejecting the testimony. *See Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988); *Carroll v. Sec. of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983); *Brandon v. Bowen*, 666 F. Supp. 604, 609 (S.D.N.Y. 1987).

### b. *Treating Source Opinion*

Hand-in-hand with the duty to develop the record is the "treating physician rule."[11] *See Batista v. Barnhart*, 326 F. Supp.2d 345, 353 (E.D.N.Y. 2004). The treating physician rule requires ALJs to give controlling weight to opinions of claimants' treating physicians regarding the nature and severity of

---

[11] When evidence from a treating physician is inadequate to make a determination, ALJs have an affirmative duty to develop the record. 20 C.F.R. § 404.1512(e)(1) ("[the SSA] will seek additional evidence or clarification from [a claimant's] medical source when the report from [the] medical source contains a conflict or ambiguity that must be resolved [or] does not contain all the necessary information . . . ."); *see also Rosa*, 168 F.3d at 79.

impairments, provided they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Halloran v. Barnhart*, 362 F.3d 28, 31–32 (2d Cir. 2004); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

When controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), an ALJ must consider the following factors in determining how much weight, if any, to give such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Halloran*, 362 F.3d at 32; *Shaw*, 221 F.3d at 134.

Treating physician opinion may be rejected based upon proper consideration of any of these factors. Although these factors must be substantively applied; failure to expressly recite them in a written decision does not necessarily result in a remand. *See Halloran*, 362 F.3d at 32. Nonetheless, ALJs must "always give good reasons" for the weight they assign to a treating source's opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Failure to do so is ground for remand. *Halloran*, 362 F.3d at 33 ("[the court does] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion.").

When treating source opinion swims upstream (*i.e.*, contradicting the bulk of other substantial evidence, such as opinions of other medical experts), it may

not be entitled to controlling weight. *See Williams v. Commissioner of Soc. Sec.*, 236 Fed. App'x 641, 643-44 (2d Cir. 2007); *see also Veino*, 312 F.3d at 588. A treating physician's opinion also may be discounted when it is internally inconsistent. *See Micheli v. Astrue*, No. 11–4756–cv, 2012 WL 5259138, at *2 (2d Cir. Oct. 25, 2012). It is not error for an ALJ to refuse to find a physician's opinion controlling when the physician's relationship to the claimant is "limited and remote." *Petrie v. Astrue*, 412 Fed. App'x 401, 405 (2d Cir. 2011). Similarly, treating source opinion can be rejected for lack of underlying expertise, or when it is brief, conclusory and unsupported by clinical findings, or when it appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy reasonably is suspected.[12]

### 3. <u>Residual Functional Capacity</u>

At Step 4 of the sequential disability analysis, and at Step 7 of the sequential medical-improvement analysis, an ALJ must determine a claimant's "residual functional capacity" (RFC). This bureaucratic term refers to what claimants can still do in a work setting despite physical and/or mental limitations caused by their impairments and any related symptoms, such as pain. *See* 20 C.F.R. §§ 404.1545, 416.945; *see also Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (defining RFC). Administrative law judges thus decide

---

[12]     *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) ("[M]any physicians (including those most likely to attract patients who are thinking of seeking disability benefits,...) will often bend over backwards to assist a patient in obtaining benefits.") (parenthesis in original); *Labonne v. Astrue*, 341 Fed. App'x 220, 225 (7th Cir. 2009) ("[A]n ALJ may reject a treating physician's opinion over doubts about the physician's impartiality, particularly since treating physicians can be overly sympathetic to their patients' disability claims."); *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985) (citing *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir. 1982)) ("The ALJ may also reject a treating physician's opinion if he finds, with support in the record, that the physician is not credible and is 'leaning over backwards to support the application for disability benefits.'").

whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96-8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed. Reg. 34474, 1996 WL 374184, at *4 (S.S.A. July 2, 1996).

The Commissioner provides detailed guidance for determining RFC in the form of a formal regulation and also an internal policy ruling. Collectively, these directives (a) identify various ordinary physical functions to be considered in context of an ordinary work schedule, (b) require function-by-function assessments of those activities, and (c) dictate that an ultimate RFC determination account for limitations imposed by both severe and non-severe impairments. *See* 20 C.F.R. §§ 404.1545(a)(2), 404.1545(b), 416.945(a)(2), 416.945(b); SSR 96-8p, 1996 WL 374184, at **5, 7.

4.     Medical-Vocational Guidelines ("the grids")

At Step 5 of the sequential disability analysis, and at Step 8 of the medical improvement analysis, an ALJ determines whether claimants, despite their impairments, can still do work existing in the national economy. Under both forms of analysis, the burden rests with the Commissioner at this stage.

Generally, an ALJ elicits or consults expert vocational testimony or officially-published data to determine when a claimant's residual work skills can be used in other work and specific occupations in which they can be used. In limited circumstances, however, the Commissioner may take *administrative notice* of disability *vel non* by adopting and applying findings published in "*Medical-Vocational Guidelines*," commonly called *"the grids." See Roma v. Astrue*, 468 Fed. App'x 16, 20-21 (2d Cir. 2012); *Bapp v. Bowen*, 802 F.2d 601,

604 (2d Cir. 1986); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2. When only *exertional* impairments[13] are in play, and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, the Commissioner may directly apply the grids to determine whether work exists in the national economy which claimants can perform. *See Martin v. Astrue,* 337 Fed. App'x 87, 91 (2d Cir. 2009); *Thompson v. Barnhart,* 75 Fed. App'x 842, 844 (2d Cir. 2003) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.[14]

A grid rule does not apply directly when RFC findings do not coincide with all the grid criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00. Since the grids do not take into account limiting or disabling effects of *nonexertional* impairments,[15] direct application of the grids to determine disability is not

---

[13]     "An exertional impairment is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet . . . strength demands of jobs (*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling)." *Bogardus-Fry v. Astrue*, No. 7:11-CV-883 (MAD), 2012 WL 3779132, at *15 n. 14 (N.D.N.Y. Aug. 31, 2012) (citing 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *Rodriguez v. Apfel*, No. 96 Civ. 8330(JGK), 1998 WL 150981, at *10, n. 12 (S.D.N.Y. Mar. 31, 1998)).

[14]     The grids are a matrix of general findings – established by rule – as to whether work exists in the national economy that a person can perform. "The grids take into account a claimant's RFC, as well as her age, education, and work experience." *Calabrese v. Astrue*, 358 Fed. App'x 274, 276 & n. 1 (2d Cir. 2009) (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). Ultimately, the grids yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996) (citing 20 C.F.R. § 404.1567(a)).

[15]     "Nonexertional limitations" are "limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect[ing] only your ability to meet . . . demands of jobs other than . . . strength demands . . . ." *See* 20 C.F.R. § 404.1569a(c)(1). Therefore, a nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional. SSR 96-9p, DETERMINING CAPABILITY TO DO OTHER WORK, IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 61 Fed. Reg. 34478, 34481 (July 2, 1996).

permitted. The Commissioner nonetheless permits administrative law judges to consult them as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by . . . nonexertional limitations." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2).[16]

Similarly, the grids do not factor limitations that preclude an individual from performing a *full range* of work at given exertional levels. In such instances, the Commissioner provides additional guidance through a Ruling that directs administrative judges to engage in an erosion-of-occupational-base analysis when a claimant's limitations prevent performance of a full range of even the least strenuous category of sedentary work. SSR 96–9p, DETERMINING CAPABILITY TO DO OTHER WORK, IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 61 Fed. Reg. 34478 (July 2, 1996).[17]

_____

[16] Social Security Ruling 85-15 ("SSR 85-15") addresses this "framework" analysis, and directs that when evaluating nonexertional impairments, an administrative law judge should first consult the grids, along with consideration of the claimant's RFC and vocational factors, to determine the extent of impairment caused by *exertional* limitations. *See* SSR 85-15, THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857, at *3 (SSA 1985). The administrative judge should next determine how much that claimant's "occupational base," (the entire exertional span from sedentary work through heavy work), is *further reduced* by effects of *nonexertional* impairments.

[17] When such limitations only *slightly* erode the sedentary occupational base, the grids may still be applied directly. SSR 96-9p, 61 Fed. Reg. at 34481. But, when limitations *significantly* erode the sedentary occupational base, it is appropriate to consult an extrinsic vocational resource to determine whether jobs exist in significant numbers that an individual may still be able to perform even with an eroded sedentary occupational base. *Id.* at 34483. In addition, when there is more than a slight impact on an individual's ability to perform a full range of sedentary work, but the administrative judge decides that the individual remains able to do other work, the administrative judge must cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual resides or in several regions of the country. *Id.* at 34481.

# III. Judicial Review

Judicial review of the Commissioner's denial of Social Security benefits is limited. The court's abbreviated role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562. F.3d 503, 507 (2d Cir. 2009), *cert. denied*, ___U.S.___, 130 S. Ct. 1503 (2010); *Berry*, 675 F.2d at 467; *see also* 42 U.S.C. § 405(g). When proper principles of law were applied, and the Commissioner's decision is supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also* 42 U.S.C. § 405(g); *Halloran*, 362 F.3d at 31.

Under these constraints, reviewing courts cannot retry factual issues *de novo,* nor can they substitute their interpretations of administrative records for that of the Commissioner when the record contains substantial support for the ALJ's decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Rather, in such circumstances, courts must defer to the Commissioner's resolution of conflicting evidence. *See Behling v. Commissioner of Soc. Sec.*, 369 Fed. App'x 292, 293 (2d Cir. 2010) (citing *Clark v. Commissioner*, 143 F.3d 115, 118 (2d Cir. 1998) ("[I]t is up to the agency, and not this court, to weigh the conflicting evidence in the record."))[.18] Hence, reviewing courts may not overturn the Commissioner's administrative decisions simply because they would have

---

[18] *See also Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."). "'[The Court] may only set aside a determination which is based upon legal error or not supported by substantial evidence.'" *Monette v. Astrue*, 269 Fed. App' 109, 110-11 (2d Cir. 2008)(quoting *Berry*, 675 F.2d at 467); *see also* 42 U.S.C. § 405(g).

reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012).

## A.     Substantial Evidence

"Substantial evidence" is a term of art.   It means less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *See Richardson*, 402 U.S. at 401; *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran*, 362 F.3d at 31.  Stated another way, to be "substantial" evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.*, 306 U.S. 262, 299-300 (1939), *cited in* Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed. 1991).

When conducting a substantial evidence review, a court's responsibility is "'to conduct a searching inquiry and to scrutinize the entire record, having in mind that the Social Security Act . . . is remedial in purpose.'" *Monette v. Astrue*, 269 Fed App'x 109, 110 (2d Cir. 2008) (quoting *McBrayer v. Secretary of Health & Human Servs.*, 712 F.2d 795, 798-99 (2d Cir. 1983)).   In this circuit, courts consider both objective and subjective factors: (1) objective medical facts; (2) diagnoses and opinions from treating and examining physicians; (3) subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) claimant's age, educational background, and work history.  *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983).

## B.     Review of Credibility Choices

Administrative law judges (who usually have the only opportunity to observe witnesses' demeanor, candor, fairness, intelligence and manner of testifying) obviously are best-positioned to make accurate credibility determinations.  *See Campbell*, 465 Fed. App'x at 5 (function of Commissioner, not the court, to appraise credibility); *see also Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (stating that deference is given to ALJ's decision because he is in the best position to assess the claimant's credibility).  Consequently, reviewing courts are loathe to second-guess and overturn credibility choices made by an administrative adjudicator.[19]  Courts, however, cannot abdicate their statutory duty to determine whether correct principles of law were applied and whether challenged decisions are supported by substantial evidence.  Consequently, even credibility choices are reviewed in that limited context.[20]

---

[19]     *See, e.g., Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'"); *Aponte*, 728 F.2d at 591 ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."); *see also see also Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("Normally, [the court] give[s] an ALJ's credibility determinations special deference because the ALJ is in the best position to see and hear the witness.").

[20]     When an ALJ neglects to employ the proper legal standard, the court cannot subject her credibility determination to meaningful review.  *See Meadors v. Astrue*, 370 Fed. App'x 179, 184-85 (2d Cir. 2010) (Because ALJ eschewed the two-step credibility inquiry required under 20 C.F.R. § 404.1529(c), remand required for a redetermination of claimant's RFC under the correct standard). Similarly, when an ALJ's credibility determination is based, in large part, on factual errors, the determination is not supported by substantial evidence and must be remanded.  *See Horan v. Astrue*, 350 Fed. App'x 483, 485 (2d Cir. 2009) (ALJ's credibility determination based largely on factual errors not supported by substantial evidence); *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996) (substantial evidence did not support ALJ's decision when ALJ made several factual errors in evaluating medical evidence).

C.    *Review of Medical Improvement Finding*

It is not the function of a court to determine *de novo* whether a claimant is disabled. *Irvin v. Heckler*, 592 F. Supp. 531, 536 (S.D.N.Y. 1984). When the Commissioner applied proper legal principles, judicial review of cases where disability benefits have been terminated is limited to an assessment of whether the finding that medical improvement exists is supported by substantial evidence. *Id.* Thus, absent legal error by the Commissioner, a decision to terminate benefits cannot be set aside when it is supported by substantial evidence. *See Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (affirming termination of benefits where the medical record substantially supported the Commissioner's finding of medical improvement); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) (same).

Even so, judicial remand in a termination of benefits case is appropriate for further development of evidence when the administrative record is incomplete. *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999) (outlining general remand standard in social security cases); *see also Veino*, 312 F.3d at 588 (remanding in termination of benefits case for supplementation of the record when there was no adequate basis on which to conclude whether Commissioner's finding was supported by substantial evidence); *Chavis*, 2010 WL 624039, at **8-10 (remanding in a termination of benefits case for failure to consider medical evidence); *Wright v. Commissioner of Soc. Sec.*, No. 3:06–CV–394, 2008 WL 4287387, at **8-9 (N.D.N.Y. Sept. 16, 2008) (remanding in a termination of benefits case for failure to meet substantial evidence standard or consult a vocational expert); *Batista*, 326 F. Supp. 2d. at 353 (remanding in a termination of benefits case where ALJ failed to develop the administrative record).

# IV.  The Commissioner's Decision

ALJ Greener made eighteen enumerated findings of fact and conclusions of law encompassing both the 5-Step and 8-Step sequential analyses. (T. 21-28). Under the initial 5-Step disability analysis, ALJ Greener determined that Deronde (a) was insured on the claimed onset-of-disability date, (b) has multiple severe impairments including "status post brain aneurysm requiring craniotomy and stenting,"[21] (c) has residual functional capacity only for a limited range of light work,[22] (d) cannot perform his past relevant work, and (e) cannot perform any alternative jobs available in the national economy.  Therefore, ALJ Greener concluded that Deronde was disabled commencing on December 14, 2007. (T. 24).

In the subsequent 8-Step analysis, ALJ Greener determined that (a) medical improvement occurred on March 25, 2009, (b) as of that date, Deronde's residual functional capacity improved to the extent that he can perform a full range of light work,[23] (c) Deronde, nevertheless, remains unable to perform his past relevant work, but (d) the grids (Medical-Vocational Guidelines) support a finding of "not disabled."  (T. 25-28).  Therefore, ALJ Greener concluded that Deronde's disability ended on March 25, 2009.  *Id.*

---

[21]  The other severe impairments are: headaches, diabetes mellitus, high blood pressure, lumbar spine degenerative disc disease, and obesity. (T. 21).

[22]  Deronde's ability to engage in work at the light exertional level during the course of an eight-hour work day was limited by his ability to sit only three hours, stand and/or walk no more than four hours, never push and/or pull, and never stoop, kneel, or bend.  (T. 22).

[23]  "Light work requires the ability to lift up to 20 pounds occasionally, lift 10 pounds frequently, stand and walk for up to 6 hours a day, and sit for up to two hours." *Mancuso v. Astrue*, 361 Fed. App'x 176, 178 (2d Cir. 2010) (citing 20 C.F.R. § 404.1567(b); SSR 83-10, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK—THE MEDICAL-VOCATIONAL RULES OF APPENDIX 2, 1983 WL 31251, at *5-6 (S.S.A. 1983)).

The pivotal findings for purposes of this appeal are ALJ Greener's findings that *medical improvement* occurred on March 25, 2009, and that Deronde then regained capacity to perform a *full range* of light work.

## V. Points of Alleged Error

Deronde proffers three alleged errors:

1.  The ALJ's Residual Functional Capacity finding is not supported by substantial evidence and is the product of legal error because the ALJ failed to properly apply the treating physician rule;

2.  The ALJ failed to apply the appropriate legal standards in assessing Plaintiff's credibility; and

3.  The ALJ's Step 4 determination is unsupported by substantial evidence and is the product of legal error.[24]

(Dkt. No. 12, p. 1).

The Commissioner responds that substantial evidence supports ALJ Greener's decision that Deronde was not disabled beginning on March 25, 2009. (Dkt. No. 14, pp. 8-20). The Commissioner asserts that ALJ Greener properly reviewed the medical evidence, considered Deronde's subjective complaints, and assessed his RFC to find that he could perform the full range of light work. *Id.*, at pp. 8-19. The Commissioner also contends that substantial evidence supports ALJ Greener's finding that Deronde could perform significant jobs in the national economy. *Id.*, at p. 19.

## VI. Analysis

Deronde's appeal focuses solely on ALJ Greener's medical improvement findings and conclusions.

---

[24]     "Step 4" appears to be a scrivener's error.  Deronde's brief actually argues error at Step 5.  (Dkt. No. 12, pp. 19-20).

*A.    Point of Error #1 (Violation of Treating Physician Rule)*

Deronde argues, first, that ALJ Greener erred by failing to apply and honor the treating physician rule when he afforded "little weight" to a May, 2010, "Updated Medical Source Statement" from Dr. Jay Chapman, M.D. Deronde asserts that Dr. Chapman's updated assessment was consistent with medical evidence of record, and, therefore, it was error for ALJ Greener to afford it "little weight." (Dkt. No. 12, pp. 12-16). Alternatively, Deronde contends that failure to recontact Dr. Chapman for a clarification of Deronde's function-by-function limitations constitutes a breach of the ALJ's duty to develop the record. *Id.*, at p. 16.

1.    <u>Factual Underpinnings</u>

To give this argument its full factual context, it is important, first, to understand that Dr. Chapman is a family practitioner who began treating Deronde in January, 2008, for diabetes, lumbar radiculitis and cerebral aneurysm with hemorrhage. (T. 295, 298). Dr. Chapman treated Deronde for over two years, with visits four-to-six times a year. (T. 295).

With respect to Deronde's social security applications, Dr. Chapman submitted a forensic "Medical Source Statement" dated December 8, 2008, wherein he diagnosed Deronde with diabetes, lumbar radiculitis, and cerebral aneurysm with hemorrhage. (T. 295). He indicated that Deronde's pain was not completely alleviated with medication. *Id.* He limited Deronde to no more than two to three hours of sitting and no more than four hours of standing in a normal eight hour workday. (T. 296). Dr. Chapman also indicated that Deronde could occasionally lift 20 pounds, but had significant limitations in doing repetitive lifting. *Id.* Dr. Chapman opined that Deronde's condition would interfere with

the ability to keep his neck in a constant position; and that Deronde was unable to tolerate moderate or high stress due to headaches. (T. 296-97). He also imposed additional limitations with respect to Deronde's ability to work at a regular job, including: no stooping, pushing, pulling, or bending, and "limited" kneeling. (T. 297).

During her 5-step initial disability evaluation, ALJ Greener gave Dr. Chapman's opinions substantial weight, while rejecting opinions (less favorable to Deronde) from a consulting examining physician and a state disability examiner.[25] (T. 23). Relying principally on Dr. Chapman's opinions, ALJ Greener found that Deronde's RFC as of the date of claimed disability (December 14, 2007) was only at the light exertional level and greatly limited. (T. 22). Ultimately this finding led to a grids-framework conclusion that Deronde was disabled as of that date. (T. 22-25).

In May, 2010, Dr. Chapman submitted an "Updated Medical Source Statement" wherein he opined that there is *no change* in Deronde's multiple limitations from those reported in 2008. (T. 363). When ALJ Greener conducted her 8-step medical improvement analysis, however, she afforded Dr. Chapman's more recent opinions "little weight." (T. 27).

It is apparent, then, that ALJ Greener made grossly unconventional credibility choices. She gave *substantial* weight to Dr. Chapman's opinions when determining whether Deronde was disabled, but *little* weight to Dr. Chapman's

---

[25] ALJ Greener rejected an opinion of consultative examiner Dr. Kalyani Ganesh, M.D. because Dr. Ganesh "examined the claimant only one time and the opinion was not based on all the evidence now in the record." (T. 23). She also rejected the disability examiner's opinion because the examiner "is a non-medical reviewing official who never had the opportunity to examine or even meet with the claimant." (T. 23).

opinions when determining whether Deronde experienced medical improvement. (T. 23, 27). At first blush, these bipolar credibility choices seem unfathomable.

ALJ Greener's abrupt turnabout, however, is not as bizarre as it appears initially. In between Dr. Chapman's 2008 Medical Statement and his 2010 updated statement, Dr. Chapman examined Deronde on March 25, 2009 (the date ALJ Greener determined that Deronde experienced medical improvement). (T. 25, 328-331, 332-335). Dr. Chapman's treatment notes for that examination indicate that Deronde's examination was "normal," and that he was cleared for a "chauffeur license." (T. 334). Related to that visit, Dr. Chapman also completed a "Medical Examination Report" for a "Commercial Driver Fitness Determination" required under Federal Motor Carrier Safety Regulations.[26] (T. 331). Therein, under "Medical Examiner's Comments on Health History," Dr. Chapman cryptically wrote "*recovered* from brain aneurysm *w/o neurological deficit.*" *Id.* (emphasis added).

Dr. Chapman further reviewed Deronde's vision, hearing, blood pressure/pulse rate, and blood work with *no abnormalities noted.* (T. 329). Dr. Chapman checked boxes indicating Deronde had *no abnormalities in any body system* (*e.g.*, neurological, musculoskeletal, extremities, genitor-urinary system, abdomen and viscera, lungs and chest, heart, ears, and eyes). (T. 330).

Also in the record before ALJ Greener were additional post-craniotomy treatment notes. (T. 25-27). On March 28, 2008, a lumbar spine magnetic resonance imaging ("MRI") study revealed *mild* degenerative disc disease with annular tear at L4-L5 causing bilateral neural foramina narrowing. (T. 255). There was *no evidence of nerve impingement. Id.* On February 17, 2009, a

---

[26] *See* 49 C.F.R. §§ 391.41–391.49.

computerized tomography ("CT") of Deronde's head revealed *no gross residual or recurrent aneurysm*. (T. 366). On March 20, 2009, a cervical MRI study revealed annular disc bulge at C5-C6 level with *no evidence of spinal canal stenosis or neural foramen narrowing*. (T. 365). Otherwise the MRI of Deronde's cervical spine was noted as "unremarkable." *Id.* Deronde's diabetes also was reported as being *under good control*. (T. 321, 326, 354). On June 24, 2009, Dr. Chapman indicated on treatment notes related to his subarachnoid hemorrhage that Deronde was "*cleared by neurosurg p mri and cardiac stress so ok to back to work; schedule for dot pe*." (T. 323). Moreover, on several examinations, Dr. Chapman reported "*normal examination*" or "*normal routine history and physical*." (T. 321, 354).[27]

### 2.    No Violation of Treating Physician Rule

Deronde's argument that ALJ Greener violated the treating-physician rule when giving little weight to Dr. Chapman's 2010 updated medical statement has no merit. Dr. Chapman's credibility was significantly impugned. By 2010, it appeared that he no longer was expressing objective, professional medical opinion, but, instead, was overly sympathetic and leaning over backward in an effort to help Deronde in whatever endeavor he was engaged. When Deronde sought an updated medical source statement for social security disability benefits, Dr. Chapman expressed opinions consistently supporting Deronde's claim of being so severely impaired as to be unable to engage in any form of substantial gainful employment. (T. 363). But, when Deronde sought a commercial driver license during the same relevant period, Dr. Chapman opined

---

[27]    In fairness, the court acknowledges that directly under Dr. Chapman's "normal examination" and "normal routine history and physical" assessments, he also noted "SEE UPDATED PROBLEM LIST FOR FURTHER DISCUSSION OF IMPRESSION AND PLAN FOR TODAY'S PROBLEMS" and "SEE PROBLEM LIST." (T. 321, 354).

that Deronde had no physical or other limitations that preclude him from working in that capacity. (T. 328-331).

Under these circumstances, ALJ Greener committed no error in giving little weight to Dr. Chapman's updated statement in May, 2010, wherein he opined that none of Deronde's earlier limitations had changed. Deronde is fortunate, indeed, that ALJ Greener credited even Dr. Chapman's 2008 opinions.

3. Alternative Argument Regarding Failure to Develop Record

Although argued under a point of error regarding the treating physician rule, Deronde proffers an entirely separate and analytically-distinct argument that ALJ Greener erred by not recontacting Dr. Chapman to supplement the evidentiary record with a clarification of Deronde's function-by-function limitations. When a record is incomplete, a decision based thereon is not supported by substantial evidence. *See Veino*, 312 F.3d at 588; *Chavis*, 2010 WL 624039, at **8-10; *Wright*, 2008 WL 4287387, at **8-9; *Batista*, 326 F. Supp. 2d. at 353.

Given ostensible inconsistencies between Dr. Chapman's 2009 "Medical Examination Report" (fitness for a CDL) and his 2010 "Updated Medical Statement" (social security disability claims), one might readily agree that such clarification would have been prudent. A reviewing court, however, cannot remand on the basis of failure to implement what would have been a good idea. Rather, as explained earlier in Section II., remand based on failure to develop the record is appropriate only when there are obvious gaps in the administrative record. *See Rosa*, 168 F.3d at 79; *Perez*, 77 F.3d at 48. When an administrative judge can decide whether a claimant is disabled on existing evidence, he or she

is not required to recontact medical sources or to obtain additional evidence. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

In a typical linear case where the sole issue is disability or not, a reviewing court might conclude that this evidentiary record is complete enough to permit an informed administrative decision. But, in this nonconcentric case (where Deronde first was determined to be disabled and then determined to have experienced downstream medical improvement), analytical parameters are different. A reviewing court must focus more precisely on the narrower question of whether the record is fully developed for medical improvement purposes. In particular, the court must examine the record for its adequacy and completeness with respect to a claimant's post-medical-improvement RFC.

The *only* evidence relating to this discrete and crucial period commencing on March 25, 2009, is (a) Deronde's subjective testimony and (b) Dr. Chapman's conflicting treatment notes and forensic statements.[28] Nothing in Deronde's testimony supports a finding of RFC for a full range of light work. Nothing in Dr. Chapman's 2008 Medical Statement (to which ALJ Greener initially gave great weight) supports such a finding. Nothing in Dr. Chapman's Updated 2010 Medical Statement supports such a finding.

The only post-medical-improvement evidence relating to increased residual functional capacity was Dr. Chapman's, March, 2009, Medical Examination Report wherein he cleared Deronde for a commercial driver license. Assuming

---

[28]    Deronde underwent a craniotomy in December, 2007. Dr. Ganesh performed a post-craniotomy examination in November, 2008, and the state disability examiner made a RFC assessment in December, 2008. (T. 289-292, 299-304). Under a strained view, this evidence might be considered post-medical-improvement evidence, but it does not figure significantly into the equation because from the outset, ALJ Greener discounted or rejected these opinions. (T. 23).

*arguendo* that ALJ Greener was free to cherry-pick only this evidence from among Dr. Chapman's several opinions to the contrary, neither that report nor published CDL certification standards of 49 C.F.R. § 391.41 themselves support such a finding, or constitute a function-by-function analysis of specific physical abilities as required by the Commissioner's regulations and interpretive ruling. *See* 20 C.F.R. §§ 404.1545(a)(2), 404.1545(b), 416.945(a)(2), 416.945(b); SSR 96-8p, 1996 WL 374184, at **5, 7.

ALJ Greener did not independently conduct a prescribed function-by-function assessment of post-medical-improvement RFC in her decision. Dr. Chapman's "Commercial Driver Fitness Determination" required under Federal Motor Carrier Safety Regulations is not an adequate surrogate therefor because 49 C.F.R. § 391.41 does not discuss sitting, standing, walking, pushing, pulling, bending, *etc*. Rather, it deems a person qualified for commercial driving by ruling out overall body system impairments. *See* 49 C.F.R. § 391.41. For example, the regulation provides, "[a] person is physically qualified to drive a commercial motor vehicle if that person . . . [h]as no current clinical diagnosis of high blood pressure likely to interfere with his/her ability to operate a commercial motor vehicle safely." 49 C.F.R. § 391.41(b)(6).

ALJ Greener apparently presumed that *all* non-exertional restrictions originally articulated by Dr. Chapman were no longer present if Dr. Chapman could certify Deronde for a CDL. It is not logical to assume, however, that medical improvement categorically eliminates every physical limitation. And, at best, Dr. Chapman's certification is ambiguous on this point. ALJ Greener thus improperly interjected her own medical judgment rather than seeking clarification from Dr. Chapman or a more credible independent medical source. *See Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir. 1998) (finding that in the

absence of a medical opinion to support the ALJ's finding, "it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.") (internal citations omitted).

Consequently, this reviewing court is constrained to conclude that (a) a legally-correct assessment of Deronde's post-medical-improvement residual functional capacity was not conducted, and (b) even had such assessment been undertaken, substantial evidence does not support a finding of capacity for a full range of light work. Simply put, the evidence in hand was inadequate for ALJ Greener to determine Deronde's post-medical-improvement RFC. With both consultative opinions off the table, no doctor examined Deronde's functional abilities aside from Dr. Chapman. Had this been a typical case (*i.e.*, benefits granted and, at some later time, a continuing disability review), almost certainly an updated consultative examination would have been ordered.

Absent a valid RFC assessment, ALJ Greener could not determine whether Deronde's disability does or does not continue. Obvious gaps in the administrative record mandate further acquisition of information before ALJ Greener or her successor can make a proper determination of whether Deronde has, indeed, experienced medical improvement, and, if so, his current RFC.

Deronde's alternative argument that ALJ Greener erred in not fully developing the record is meritorious, and this action must be remanded.

B.    *Remaining Points of Error*

Deronde's remaining points of error relate to ALJ Greener's allegedly improper assessment of credibility and use of the grids at Step 5. The court need not address these points on the merits because the outcome of this case will not change.

On remand, however, the Commissioner should reflect on *all* errors asserted in this action as set forth in Section IV. Specifically, the Commissioner should assure that Deronde's credibility is judged in full accord with the Commisioner's own standards noted earlier in SSR 96-7p. Similarly, if Deronde's continuing disability is to be determined by resort to the Medical-Vocational Guidelines, the Commissioner should insure that a proper framework analysis (erosion of occupational base) is conducted if grid rules cannot be applied directly.

## VII. Recommendation

The Commissioner's decision should be **REVERSED** and the case **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings including consideration of: (a) clarification of Deronde's functional abilities and/or an independent medical examination to determine the same; (b) review of Deronde's credibility in accordance with SSR 96-7p; (c) reevaluation of Deronde's residual functional capacity in accordance with an updated report of his functional abilities; (d) explanation of the connection between medical improvement, if any, and any adjusted RFC; (e) description of the extent to which Deronde's occupational base is eroded by nonexertional impairments, if any; and (f) if desirable or necessary, testimony of either a vocational expert or other similar evidence regarding the existence of jobs in the national economy for an individual with Deronde's limitations.

## VIII.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___11___ day of ____February____ 2013.

_____

Earl S. Hines
United States Magistrate Judge